**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Willie Marvin Williams, Respondent-Petitioner,

v.

State of South Carolina, Petitioner-Respondent.

Appellate Case No. 2020-000796

———————

Appeal From Greenville County
Robin B. Stilwell, Circuit Court Judge

———————

Unpublished Opinion No. 2025-UP-077
Heard December 5, 2024 – Filed March 5, 2025

———————

**REVERSED**

———————

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, and Senior
Assistant Deputy Attorney General Melody Jane Brown,
all of Columbia, for Petitioner.

Senior Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Respondent.

———————

**PER CURIAM:** In this appeal from the grant of Willie Marvin Williams's application for post-conviction relief (PCR), this court granted certiorari to review

whether the PCR court erred in (1) finding that trial counsel was ineffective for failing to object to the trial court's jury charge on mutual combat and (2) denying the State's motion to alter or amend the order granting PCR without specifying whether it granted relief on all or some of Williams's convictions. The State argues that if the PCR court's grant of PCR is allowed to stand, it should be limited to Williams's murder conviction. We reverse.

**FACTS AND PROCEDURAL HISTORY**

In April 2013, a Greenville County grand jury indicted Williams for murder, attempted murder, unlawful conduct towards a child, and possession of a weapon during the commission of a violent crime. Williams was accused of murdering his wife, Natasha Kerns, attempting to murder Kerns's boyfriend, Anthony Wilson, and unlawful conduct towards Kerns's son (Son).

Kerns called 911 from her cell phone on July 10, 2010, at about 4:50 a.m. On the recording of the 911 call, Kerns told the operator that she believed someone was outside her home because she heard noises and her dogs barking. She stated she and Williams were divorcing and that an order of protection was in progress. She stated she had a pistol for her own protection. She then told the 911 operator that the person outside was Williams and that he was on her front porch. After a loud noise could be heard on the recording, Kerns stopped responding to the 911 operator.

During the trial, Son[1] testified that on the night of Kerns's death he knew something was wrong when he "heard the first fire." He testified that Wilson was in his room when this occurred. Son recalled that he saw Williams's Chrysler outside his window. Son testified he crawled into the hallway because he heard gunfire and saw Williams standing over Kerns's body shooting her. Son stated he saw Williams leave in his car.

Wilson testified he met Kerns at a night club in Charlotte. He recalled that on July 9, 2010, he visited Kerns in Greenville and spent time with her, Son, and her daughter (Daughter). Wilson stated he woke up after going to sleep in Kerns's house because he heard the dog barking and "some ruckus going on around outside the house." He testified that Kerns got out of bed, grabbed a gun from the floor under her bed, and ran towards the front of the house. Wilson stated he took Daughter to Son's room. He remembered hearing Kerns saying "something about

---

[1] Son was nine years old at the time of the incident and twelve when he testified at trial.

get away from my property, get away from my house, and stuff like that." Wilson stated he heard banging outside and Kerns talking before it went "straight silent." He testified he put Daughter on the bed with Son and then saw "a silhouette of a human being coming down the hallway." He stated the person he saw was a man he had never seen before. Wilson testified the man looked in Kerns's room, then walked down the hallway and shot into Son's room three times, hitting Wilson with the first shot. Wilson testified he was unconscious for an unknown amount of time and woke up to Son shaking him. He stated that when he left Son's room, he found Kerns dead by the window in the front room of the house and that before he could leave the house the police arrived.

Cynthia Booker, who was Williams's girlfriend in July 2010, testified that she, her aunt, and Williams went to a club on the night of July 9, 2010. Booker stated that Williams left her and her aunt at the club around 3:45 a.m. on July 10, 2010. She testified that Williams left in a hurry and she and her aunt had to find another ride home.

Williams testified he called Kerns around 4:15 or 4:30 a.m. on July 10, 2010, but she did not answer. He stated he then drove to Kerns's house, where he saw a vehicle that he did not recognize. Williams testified he attempted to open the storm door of the house but found it was locked. He testified he knocked on the front door of the house for three to five minutes but received no answer. He recalled that when he turned to walk away from the door he saw a curtain move, so he tried to "peep in through the window." Williams testified he then heard a noise behind him and turned to see a man, whom he identified as Wilson, approaching him with a gun pointed at him. He demonstrated how he acted in self-defense to the jury. He stated the gun went off while the men were struggling with each other. Williams testified that they continued "wrestling" and fell through the window into the home. He recalled the other man "got away from" him and may have lost the gun temporarily before retrieving it. Williams stated he and the man continued to fight as they moved through the house, during which the gun was fired three times and the man fell to the ground. He testified he did not see Daughter or Son in the bedrooms. He stated he then found Kerns in the front room with no pulse and he began to have an "anxiety attack." Williams testified he saw that Kerns had called 911, "flipped out," and left the home.

Williams testified he went home, paced around his yard, and then got back in the Chrysler. He stated that when he saw the Chrysler's gas light was on, he decided to drive his Chevrolet Tahoe instead. Williams recalled that he drove towards Laurens, stopped at the church where his mother was buried, and went to find Son and Daughter. Williams stated he stopped and spoke to a friend of his, Tracy Irby,

and told him he had "messed up" because if he had not gone to Kerns's house he "wouldn't have got into the altercation and things." Williams testified he had decided to return to his house when he passed a Laurens County Sheriff's officer's car that began to follow him. He stated he continued to drive through Laurens with the officer following him and that the police had blocked various roads to stop him. Williams recalled that he had turned into a parking lot to avoid police when the officer's car hit the back of the Tahoe. He testified that he took a knife out of the Tahoe's glove compartment and stabbed himself in the chest because he was suicidal.

The parties stipulated that a properly administered and stored gunshot residue test was performed on Wilson and showed he had gunshot residue on his right palm, the back of his right hand, his left palm, and the back of his left hand. The parties further stipulated that a handprint found on a 1995 Lexus parked behind Kerns's home was identified as Wilson's handprint.

James William Armstrong, who worked in the forensics division crime laboratory for the Greenville County Department of Public Safety, testified that gunshot reside could get on a person's hands "from actual contact with an area that may have gunshot residue on it, being in close proximity of a firearm when it's being fired, or even handling firearms." Armstrong also testified that the bullet from Kerns's autopsy, the bullet recovered from the wall of Son's room, and bullets taken by police from Williams's home in Laurens pursuant to a search warrant were all .38 caliber bullets.

The trial court charged the jury on self-defense and accident. The trial court also charged the jury on mutual combat, stating:

> If the Defendant voluntarily participated in mutual combat for purposes other than protection, the killing of the victim would not be self-defense. This is true if even during the combat the Defendant feared death or serious bodily injury. However, if before the killing is committed, the Defendant withdraws and tried in good faith to avoid further conflict and either by word or act makes the fact known to the victim, he would be without fault in bringing on the difficulty. For mutual combat, there must be a mutual intent and willingness to fight. This intent may be shown by the acts and conduct of the parties and the circumstances surrounding the combat. In

addition, it must be shown that both parties were armed with a deadly weapon.

Trial counsel did not object to the trial court's instruction.

The jury found Williams guilty as indicted, and the trial court sentenced him to life imprisonment for murder, thirty years' imprisonment for attempted murder, and ten years imprisonment for unlawful conduct towards a child. The trial court also imposed a sentence of five years' imprisonment, suspended to time served, on the charge of possession of a weapon during the commission of a violent crime. Williams appealed and this court affirmed his convictions. *State v. Williams*, 2016-UP-215 (S.C. Ct. App. filed May 18, 2016). Williams filed an application for PCR on December 28, 2016. In his PCR application, Williams argued, among other things, that "trial counsel was ineffective in failing to object to the jury charge as to mutual combat when no evidence was presented in support of such a charge."

During the PCR hearing, Williams testified that Wilson's "bloody handprint" on the car behind Kerns's house was proof he went outside that night despite the fact that Wilson did not admit to going outside Kerns's house after her death. Williams stated that the inconsistencies in the trial transcript indicated that the State did not have a solid case due to factual disputes and therefore an error of law could have affected the outcome of the case. One of Williams's trial counsel testified he did not recall whether the trial court instructed the jury that mutual combat negated self-defense. Both trial counsel testified they were not familiar with *State v. Taylor*,[2] in which our supreme court held that the trial court's mutual combat charge acted as a limitation on a defendant's ability to claim self-defense.

The PCR court granted PCR, finding trial counsel was ineffective for failing to object to the jury charge on mutual combat. The PCR court found that the mutual combat charge negated the self-defense charge and therefore prejudiced Williams. The PCR court also found a reasonable criminal defense attorney should have been aware of the *Taylor* case and that even if they were not aware of *Taylor*, trial counsel should have objected to the mutual combat charge because the evidence did not support mutual combat.

---

[2] 356 S.C. 227, 235, 589 S.E.2d 1, 5 (2003) (finding that "the court's mutual combat charge acted as a limitation on the Petitioner's ability to claim self-defense, and prejudiced him by transferring the *State's burden* to disprove self-defense onto the Petitioner, forcing him to prove self-defense").

The PCR court's order stated "the conviction of Willie M. Williams is overturned and a new trial is granted." The State filed a Rule 59(e), SCRCP, motion, arguing the PCR court should clarify which of Williams's convictions were affected by the grant of PCR and that the grant of a new trial should be limited to his murder conviction. The State also argued the PCR court erred in granting PCR because the mutual combat charge did not prejudice Williams when self-defense was not his main argument and any burden shifting caused by the instruction did not prevent him from asserting his main defense, that of accident. The PCR court denied the State's motion.

## ANAYSIS

"In post-conviction proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). An appellate court will "defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018). However, an appellate court "review[s] questions of law de novo, with no deference to trial courts." *Id.* at 180-81, 810 S.E.2d at 839.

## I.      Ineffective Assistance of Counsel

The State argues the PCR court erred in finding trial counsel deficient for failing to object to the trial court's jury charge on mutual combat. The State further argues the PCR court erred in finding the mutual combat jury instruction prejudiced Williams because his primary defense at trial was accident, not self-defense, and there was no reasonable probability of a different outcome had the trial court not given the mutual combat charge "when the overwhelming evidence fail[ed] to show self-defense." We agree in part.

We hold the PCR court erred by finding that trial counsel's deficient performance prejudiced Williams. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694-96 (1984) (holding that to establish a claim for ineffective assistance of counsel, a PCR applicant must show (1) counsel's performance was deficient because it fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different); *id.* at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). We hold there is no reasonable probability the result of the trial would have been different had trial counsel objected to the trial court's mutual combat charge given the evidence presented. *See Jackson v. State*, 355 S.C. 568, 573, 586 S.E.2d 562,

565 (2003) (reversing the PCR court's grant of PCR, finding that although counsel was deficient for failing to request a self-defense charge, the instruction would not have affected the outcome of trial given the overwhelming evidence presented of Jackson's guilt). Williams testified he was served notice of a July 13, 2010 court hearing for an order of protection Kerns sought against him and for child support. He stated Kerns had told him she was afraid of him and had called the police because she said he was threatening her during an argument they had in May 2010. Booker recalled Williams leaving her and her aunt abruptly at a club in the early morning of July 10, 2010. On the recording of her 911 call, Kerns stated she believed Williams was on her front porch. Seconds later, a loud noise was heard and Kerns stopped responding to the 911 operator. Kerns was shot through the front window of her home. Taken together with Williams's testimony, the 911 call contradicted his version of events. Wilson and Son testified that Wilson was in Son's room when Williams entered Kerns's house and began shooting, contradicting Williams's testimony that Wilson approached him outside the house with a gun and that the shooting occurred while they fought. Williams also switched cars when he returned home, led police on a high-speed chase, and stabbed himself with a knife after an officer hit his car with a patrol car to force him to stop. Additionally, Officers found bullets of the same caliber as those used in the shooting in Williams's house in Laurens. Given the evidence presented during the trial, we hold there is no reasonable probability the outcome of the trial would have been different had the trial court not given the mutual combat charge. Accordingly, we reverse the PCR court's grant of PCR.

## II.     Convictions Affected by PCR

The State argues the PCR court erred by failing to specify whether it granted a new trial only as to Williams's murder conviction or as to all of his convictions. Because we reverse the PCR court's grant of PCR, this court need not reach this issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court need not address the appellant's remaining issues when its determination of a prior issue is dispositive of the appeal).

## CONCLUSION

Based on the foregoing, the PCR court's order granting Williams's application for PCR is

**REVERSED.**

**THOMAS, HEWITT, and VINSON, JJ., concur.**